Scranton Medical Building v. Commissioner.
Scranton Med. Bldg. v. Commissioner
Docket No. 26516.
United States Tax Court
1952 Tax Ct. Memo LEXIS 59; 11 T.C.M. (CCH) 1027; T.C.M. (RIA) 52306; October 24, 1952
*59 Reasonable rates of depreciation of a building and equipment therein determined. Maurice Survis, Esq., 420 Lincoln Rd., Miami Beach, Fla., for the petitioner. Charles J. Hickey, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income taxes of petitioner for the taxable years 1946 and 1947, as follows: 1946
$4,143.42
1947
2,486.53
The issue presented involves the determination by us of reasonable amounts allowable for depreciation of petitioner's building and of the equipment attached thereto for the taxable years 1944, 1945, 1946 and 1947. Findings of Fact Those facts that have been stipulated are so found and made a part hereof. The petitioner in this proceeding is the Scranton Medical Building. The Building company was organized and is operating as a Pennsylvania corporation. It is located and maintains its principal place of business at 323-33 North Washington Avenue, in the city of Scranton, Lackawanna County, Pennsylvania. The income tax returns for the periods here involved were filed with the collector of internal revenue for the twelfth district of Pennsylvania, *60 at Scranton. Petitioner's building occupies approximately 50 per cent of the lot fronting 103 feet along the westerly side of North Washington Avenue between Linden and Mulberry Streets. The lot has a depth of 160 feet back to Breck Court in the rear. The unimproved area in the rear of the lot has been developed as parking facilities. The original cost of petitioner's land as of December 31, 1929, was $168,634. The building is the only one of its type in Scranton. It enjoys a good reputation and space therein is very much in demand. Many of the city's leading members of medical and dental professions are its tenants. The building is well located in that it is readily accessible to public and private transportation. There are two streetcar lines which pass the building. Other transportation lines are within a few blocks. Its location is 1 1/2 blocks from the Morris Bus Terminal, 2 blocks from the Greyhound Bus Terminal, and 3 1/2 blocks from the Lackawanna Railroad Station. There is a small parking lot adjoining the building and directly in the rear of it is a parking area for many of its tenants. Across Breck Court in the rear is located a garage providing open-air, as well as *61 covered, parking. Within a block and a half are located two large parking lots on Wyoming Avenue. Petitioner's building is well managed and is in excellent condition. A high standard of cleanliness is maintained throughout and there is unrestricted air and light on all four sides. The main portion of the building is 10 stories high. On each side of this main structure, and fronting on North Washington Avenue, is a 2-story wing. Only one such wing has a basement. The ground floor consists of commercial store rentals and a lobby. The lobby has floors of tile and the walls are marble as far as the elevators. The upper floors are divided into office suites for rental to medical and dental practitioners, excepting for a few offices for businesses allied to the medical and dental professions and the real estate offices handling the management of the building. The floor plan of each of the upper stories differs from the others. When the building was first constructed, these upper floors were left unfinished except as to the corridor partitions, toilets on each floor, the elevator shaft, and the stairs. As tenants were obtained, the various office suites were designed to meet the requirements *62 and specifications of the individual tenant as to the consultation rooms, treatment rooms, laboratories, dark rooms, rest rooms, etc., and accordingly constructed in the particular location chosen by the tenant. The plumbing and lighting were likewise installed to satisfy the needs of the tenant. Such suites were constructed with permanent 4 1/2 inch partitions of 3 inch gypsum blocks with 3/4 inch plaster on each side, and the necessary doors leading from room to room. A portion of the building is tiled for operation room purposes. To convert the building to an ordinary office building would require extensive modification and would be very costly. The building is constructed of concrete interlaced or reinforced with steel rods. It is the only building in Scranton of this type of construction, all other large buildings in the city being steel frame buildings. Petitioner's building does not have a girder steel frame. The building is not air-conditioned. The rentable floor space in the building, excluding the basement, is 47,263.5 square feet. The building was completed and opened for occupancy on April 1, 1929. The original cost thereof as at December 31, 1929, was $322,452.14. *63 During the years 1944 to 1947, inclusive, the building had, inter alia, the following equipment: Two passenger elevators; two low-pressure steam boilers which supply steam for the vacuum heating system; a hot water heater with a 1,000-gallon tank supplying hot water to the building; an ice machine supplying ice water to the various floors; public toilets on each floor; lavatories for the doctors' offices; sewer and water extensions for dental equipment; plumbing facilities furnishing compressed air; and gas and electric refrigerators for protecting medical supplies. The original cost of the equipment and machinery in the building as of December 31, 1929, was as follows: Elevators
$ 17,500.00
Plumbing and Heating
63,647.86
Electrical work
17,721.00
Electrical fixtures
1,992.05
Equipment
1,226.62
Total
$102,087.53 [1]
Petitioner has employed the "straight line" method of depreciation *64 based upon an estimated useful life of the building and for its equipment, on a composite basis, as of December 31, 1929, as follows: Building
33 1/3 years
Attached equipment
20 years
Movable equipment
5-10 years
The foregoing useful life of the building equipment and machinery was estimated in 1929 after its managing agent had consulted with real estate men who had erected medical arts buildings both in Norfolk, Virginia, and Wilmington, Delaware; the contractor who constructed the building here involved, as well as similar ones in Richmond, Virginia, Washington, D.C., Wilmington, Delaware, and Baltimore, Maryland; and the doctors who were petitioner's board of directors. Prior to the erection of the building, petitioner's agent conferred with certain mining engineers as to the possibility of future subsidence of the land on which it was to be built. Not until it had received the assurance of these engineers that, in their opinion, the area was safe for the contemplated erection of the building did petitioner proceed with its construction. Petitioner, in determining the rate of depreciation to be applied, took into consideration the underlying conditions *65 and the possibility of a slide, squeeze, or cave-in of the supporting land. The true and correct depreciation of the building and its equipment, allowed, or allowable, for the taxable years 1929 to 1943, inclusive, is as follows: Year
Building
Equipment
Total
1929
$ 4,718.71
$2,578.84
$ 7,297.55
1930
10,341.98
5,180.88
15,522.86
1931
10,780.52
5,193.68
15,974.20
1932
10,902.07
5,417.55
16,319.62
1933
10,935.35
5,525.76
16,461.11
1934
10,948.50
5,529.29
16,477.79
1935
10,958.37
5,531.17
16,489.54
1936
10,958.93
5,514.92
16,473.85
1937
10,958.93
5,512.14
16,471.07
1938
10,958.93
5,480.79
16,439.72
1939
10,958.93
5,421.38
16,380.31
1940
10,958.93
5,248.79
16,207.72
1941
10,962.75
5,362.18
16,324.93
1942
10,966.58
5,421.13
16,387.71
1943
10,966.58
5,420.93
16,387.51
For the taxable years 1944 and 1945, petitioner took deductions for depreciation, respectively, as follows: 1944
1945
Building
$11,133.00
$11,133.00
Equipment
5,345.05
5,345.50
Total
$16,478.05
$16,478.50
The amount of depreciation taken by petitioner for each of the taxable years 1946 and 1947, is respectively, *66 as follows: 1946
1947
Building
$11,133.00
$11,133.00
Equipment
5,350.01
5,371.10
Total
$16,483.01
$16,504.10
On the basis of the depreciation rates thus claimed by petitioner, the elevators in its building have been fully depreciated and charged off as of the year 1949. The elevators are still in use and on the basis of the depreciation allowances determined by respondent, they do not become fully depreciated until 1954. Petitioner has consistently applied the same rates in computing the above deductions for depreciation on its building and equipment for the years 1929 to 1947, inclusive. The deductions thus claimed were not challenged by respondent prior to the investigation, in 1949, of petitioner's income tax liabilities for the taxable years 1946 and 1947. By reason of reported net operating losses for the taxable years 1944 and 1945, which losses were carried over and claimed as deductions for the taxable years 1946 and 1947, the respondent broadened his investigation to cover the years 1944 and 1945, which years were barred by the statute of limitations, in order to determine the amounts of net operating losses, if any, to be carried forward *67 as deductions in computing taxable income for the subsequent years. In his notice of deficiency, under date of December 1, 1949, respondent determined a longer useful life for petitioner's building and equipment than had been originally estimated in 1929, and, accordingly, reduced the depreciation rate applicable thereto. The remaining useful life so determined, effective as of January 1, 1944, is as follows: Building
40 years
Elevators
10 years
Plumbing and heating
10 years
Electrical work
10 years
Electrical fixtures
10 years
Miscellaneous equipment
Various
Additional equipment 1945
Additional equipment 1946
Various
Additional equipment 1947
Respondent did not allow any depreciation for the items coming within the above category titled "Additional equipment". Application of the revised depreciation rate, so determined, to the items coming within the above remaining categories, effected a reduction of the depreciation deductions taken for the taxable years 1944 and 1945, respectively, to the following: 1944
1945
Building
$5,345.60
$5,345.60
Equipment
2,947.31
2,947.76
Total
$8,292.91
$8,293.36
The amounts so deducted *68 in both years in excess of the foregoing, or $8,185.14, were eliminated as excessive in determining that petitioner had no net operating loss in either year to carry over to the taxable years 1946 and 1947. A summary of the earnings of the Scranton Medical Building for the years 1929 to 1947, inclusive, is as follows: Year
Profit
Loss
1929
$ 456.23
1930
2,050.93
1931
2,819.23
1932
$1,252.38
1933
81.49
1934
427.84
1935
8.15
1936
1,349.54
1937
2,500.75
1938
1,187.39
1939
5,266.57
1940
2,312.90
1941
6,236.69
1942
5,804.65
1943
80.40
1944
8,007.37
1945
3,341.91
1946
10,264.51
1947
14,120.39
The first dividend ever to be paid to stockholders was in 1949 when 4 per cent was paid to the preferred stockholders. The percentage of the building's available office space rented during the years 1939 to 1947, inclusive, was as follows: Year
Rate of Occupancy
1939
72 1/2%
1940
70%
1941
70%
1942
56 1/2%
1943
59%
1944
66%
1945
84 1/2%
1946
84 1/2%
1947
84 1/2% In order to make it a profitable enterprise, economically, the building should be rented at an average rate of occupancy of *69 85 per cent. There has been a gradual decline of coal production in the Scranton area for several years past. In 1941, this decline was demonstrated by the relatively high unemployment that was prevalent. At that time, the country had started upon a rearmament program, and, during the period leading up to this country's entry into World War II, Scranton's unemployed were either drafted into the Armed Services or migrated to other areas to enter into defense work. In order to allay this shifting of population out of the Scranton area, the Chamber of Commerce started a program of enlisting the interest of official Washington in locating defense plants in the community where there existed manpower, adequate housing, schools, etc. As a result of this effort, the War Production Board located some defense plants in Scranton, but not enough to absorb its large amount of unemployment. In 1944, Scranton was depressed and general business conditions were not good. The city had relatively few war contracts, and there were approximately 20,000 workers unemployed. In contrast to the housing shortage generally prevalent throughout the country, the Scranton area, in 1944, had over 5,000 vacant *70 homes. Petitioner's management was not concerned in 1944 with the Scranton mining situation as a serious factor in the city's economic outlook. Since the city had been in the process of converting itself into an industrial community and since this conversion trend had been rather extensively increased during the preceding few years, it was felt that any loss in mining employment would be amply made up through industrial employment. There was no substantial change in the economic condition in 1945 over 1944. The year 1945 saw the return of service personnel who were being discharged from the Armed Forces. A large number of these veterans were unable to find employment and subsisted only on the $20 per week allowed them by the Government for 52 weeks. [2] The defense plants were also curtailing employment at this time and those employees who had previously left Scranton were returning. It was in 1945 that Scranton reached its peak in unemployment. The decline of the coal industry and the loss of population continued. The Scranton Chamber of Commerce decided to launch a new campaign, a program designed to bring diversified industries into the Scranton area. In October, 1945, the Scranton-Lackawanna *71 Industrial Building Company was formed. The Scranton Plan Corporation was also formed at the same time. In 1946. a tax exempt status was granted to these two corporations upon the representation by the Chamber of Commerce that they were formed in connection with the program to promote the greatly needed industrial rehabilitation of Scranton. Pursuant to the program thus undertaken, the Scranton-Lackawanna Industrial Building Company built and leased about 10 plants during 1946 and 1947. Also, during the same period, the Scranton Industrial Development Company, an older organization formed by the Chamber of Commerce in 1914, built and leased three buildings to industries that were still operating in the area. This program began to take effect in 1946 and, while there was some general improvement in business conditions by the end of that year, there was no substantial change over the preceding year. The decline of production in the coal mines continued and unemployment was still high. In 1947, the business conditions in Scranton again showed some general improvement. Although there *72 was still a large amount of unemployment, the income of those who were employed was greater. There was an increase of income from industries, including coal, from $84,647,000 for 1946 to $96,771,100 for 1947. This increase in income was partly due to $20,000,000 of governmental aid in the form of unemployment compensation, social security, Veterans' Administration disbursements, and Department of Public Assistance grants, etc., i.e., subsidies instead of jobs. There were also substantial amounts sent into Scranton from outside by men who worked in other cities and had left their families behind. The Chamber of Commerce, in 1950, formed the Lackawanna Industrial Fund Enterprise, locally called LIFE. LIFE raised $1,300,000 to provide further life to the program for building plants and leasing them to various industries. Although this plan has been effective as an advance toward stabilizing the economy of Scranton and diversifying industry there, the city has not yet reached its goal. Reasonable rates of depreciation are as follows: The building had a remaining useful life of 30 years on January 1, 1944. The equipment attached to the building had a remaining useful life on such *73 date of 10 years. Miscellaneous movable equipment had a remaining useful life on such date of 5 years. Opinion VAN FOSSAN, Judge: The deficiencies here contested result from respondent's disallowance of claimed net operating losses carried over by petitioner from 1944 and 1945 as deductions on its returns for 1946 and 1947, the taxable years here involved. Such disallowance was the consequence of respondent's downward revision of the depreciation rate applicable to petitioner's building and equipment therein as of January 1, 1944, and subsequently. Fundamentally, the sole issue presented involves the propriety of respondent's action with respect to depreciation rates to be applied to petitioner's assets, pursuant to section 23(1), Internal Revenue Code. [3]
The question thus posed is essentially *74 one of fact, and those pertinent thereto have been extensively set forth above. Briefly summarized, however, petitioner's building was erected and first opened in the year 1929 as a central location for offices of persons of the medical and dental professions. It is the only building of its type in Scranton, Pennsylvania. From 1929 through 1947, petitioner employed the "straight line" method of depreciation and took deductions therefor based upon an estimated useful life of the building of 33-1/3 years. The same method was utilized for depreciating the equipment therein on a composite basis of 20 years estimated useful life. The miscellaneous movable equipment, about which there here arises no dispute, was depreciated at various rates from five to ten years. These rates and consequent deductions were allowed by respondent throughout the period from 1929 through 1943. Prefatory to his notice of deficiency, respondent determined that as of January 1, 1944, the building had an estimated remaining useful life of 40 years, and the equipment therein of 10 years. In such notice of deficiency, respondent applied the revised rates, and disallowed the amounts claimed by petitioner in excess *75 thereof. Such disallowance and application of revised rates for the years 1944 and 1945 had the effect of wiping out the net operating losses claimed for those years and carried over as deductions in computing petitioner's taxable income for the years 1946 and 1947, and gave rise to the deficiencies upon which this litigation is based. Petitioner resists any change in the methods and rates as originally determined, in 1929, and consistently applied by it in each year since. Petitioner has introduced evidence through the medium of expert testimony to support its attack upon respondent's action. This evidence tends to show the wear and tear and obsolescence sustained by the building and equipment therein during the 15 to 18 years following the building's erection and initial occupancy and the condition of same as at the end of each year here involved; the uncertainty of economic conditions generally in the Scranton area during the period under scrutiny and their effect upon estimating the future life of the building as of that period; the gradual depletion of the available coal supply; and the loss of population of Scranton, together with certain trends affecting the medical and dental *76 professions as a whole, which were matters of concern to petitioner's management. There is also heavy reliance placed upon the fact that the methods and rates originally adopted by petitioner in 1929 have, each year since, been continuously and consistently applied and have been allowed by respondent, without apparent question or contest, until the present controversy arose. Respondent relies on his Bulletin "F" and on the testimony of an expert witness, whose conclusions coincided with respondent's determination of a remaining useful life for petitioner's building and equipment therein for 40 and 10 years, respectively. These conclusions, however, were admittedly based primarily upon an inspection thereof and study made some years subsequent to those in controversy and upon a comparison of same with other buildings in Scranton, about the conditions of which in such years the witness professed to have no knowledge. We have carefully weighed the evidence and find that a "jury verdict" is dictated. The truth does not lie wholly on either side. To a local pessimist in 1944, Scranton was doomed to gradual retrogradation, while to the local optimist, the depressed condition was transitory *77 and the radiant gleam of brighter days could be seen behind the lowering clouds. We are of the opinion, based on the entire record, that as of January 1, 1944, the Scranton Medical Building had a remaining useful life of 30 years; the equipment attached to the building had a remaining useful life of 10 years; and the miscellaneous movable equipment had a remaining useful life of 5 years. These rates will be applied to the appropriate cost bases and depreciation for the years subsequent to January 1, 1944, so determined. After the amounts are computed, the redetermination of deficiencies in taxes for 1946 and 1947, if any, will follow. We do not deem it necessary to this opinion to review the several and widely varying arguments advanced by counsel, nor is it necessary to discuss the well-established principles which guide us in resolving a case of depreciation. Decision will be entered under Rule 50. Footnotes
1. Petitioner's managing director testified that the original cost of the equipment and machinery as of December 31, 1929, was $102,282.53. Petitioner's tax returns for 1929 show such cost as $102,287.53. There appears in the record no explanation for the obvious discrepancy.↩
2. Servicemen's Readjustment Act of 1944. Chapter 7, colloquially called the "52-20 Club".↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. * * *↩